IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br><br><br><br>          vs.<br><br><br>SAMI R. HARB and MICHAEL HARB,<br>d.b.a. MOVIES BY MAIL,<br><br>     Defendants. | MEMORANDUM DECISION AND<br>ORDER DENYING DEFENDANT<br>SAMI HARB'S MOTION TO<br>SUPPRESS STATEMENTS<br><br><br><br><br><br>Case No. 2:07-CR-426 TS |

## I.  INTRODUCTION

Defendant Sami Harb moves to suppress his statements made during the execution of a search warrant at the business premises of Movies by Mail, on the ground of a *Miranda*[1] violation.  The Court finds that Sami Harb was not in custody at the time of the statements and, therefore, no *Miranda* warning was required.  The Motion to Suppress is denied.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

1

## II.  FINDINGS OF FACT

Movies by Mail operates a mail and internet order business selling adult sexually-explicit movies from a location in a warehouse-like building in Cleveland, Ohio (the business premises).  Defendant Sami Harb is Movies by Mail's president and Defendant Michael Harb is its vice-president.  The business premises is a large 30,000 square foot warehouse with some of the building occupied by other businesses.

At approximately 9:45 a.m. on June 14, 2007, FBI Special Agent Hill together, with approximately ten FBI agents and five evidence technicians' arrived at the business premises to execute a search warrant.  The agents wore bullet proof vests, jackets that identified them as FBI, and were armed. The evidence technicians remained with the vehicles while Agents knocked on the door and announced they were the FBI with a search warrant.  A voice from inside told them to "come in."[2]  They entered and the technicians followed.

Inside, the large warehouse space was roughly divided into sections, with the entrance and front desk area set up with a plywood stand up desk (the front desk area). To one side of the front desk area was a conference room.  It had a door and large picture window that overlooked the front desk area as well as the part of the rest of the warehouse space.  There was also a back office area.  Much of the rest of the space was set up with rows of shelves of merchandise and tables for packing and mailing.

---

[2]Tr. 21.

2

On entering, the agents encountered a man at the front desk and asked him where everyone was.  He responded that they were in back office area.  The agents proceeded to fan out to secure the building and locate the employees.  They located all the employees, including Sami Harb and Michael Harb.  As the agents moved through the premises finding employees, the agents identified themselves as FBI agents executing a search warrant and asked everyone to stop what they were doing and move to front desk area.  All of the employees but the one who had been standing at the front desk complied in a calm manner.  That front desk employee demonstrated "some attitude"[3] and was briefly handcuffed for officer safety while still standing in the front desk area.

Once in the front desk area, employees were asked for identification.  Agent Hill informed Sami Harb while he was with the other employees that the FBI was executing a search warrant, "that nobody was under arrest, that everybody was free to leave, but if they chose to stay, they couldn't interfere with the search."[4]

Sami Harb saw the front desk employee in handcuffs during the identification process.  However, sometime during that identification process, the front desk employee was unhandcuffed in the presence of the other employees. It is possible that other employees such as Sami Harb may have thought that they would be handcuffed if they were not compliant with the agents' directions to stop what they were doing, move to the front desk area, and wait while being identified.

---

[3]Tr. 53.

[4]Tr. 30.

There were 10 to 12 employees present.  The agents established the employees'
identifications in a calm and orderly environment.  After being identified, and having been
told they were not under arrest and were free to leave, some of the employees left.  Others
chose to stay and speak with agents. Sami Harb was one of those who chose to stay.

Agent Hill told Sami Harb the names of the movies they were looking for and told
him that the sooner they found them, the sooner the agents could leave.  Sami Harb had
the front desk employee look up the location of the movies on the computer.

Sometime between fifteen minutes and an hour after entering the building, while
they were still standing with the other employees and agents in the front desk area, Agent
Hill asked Sami Harb if he would mind answering some questions.  The Agent's tone was
calm and conversational. Another agent asked Michael Harb if he would answer questions.
Michael Harb declined to do so, but chose to remain on the premises.

Sami Harb agreed to answer questions and Agent Hill asked if there were a place
they could sit down where it was a little quieter.  Sami Harb led Agent Hill and another
agent to the conference room.  The room was approximately 10 or 12 feet by 8 feet in size.
Among other things, it contained a round table.  Sami Harb and the agents sat at the round
table.  Sami Harb sat with his back to the back wall, facing the window where he could look
out and see what was going on in the rest of the premises.

Throughout the interview, the agents' tone was calm and professional.  Sami Harb
smoked, appeared calm, and acted cooperative and cordial.  The pace of questioning and
the interview, generally, was relaxed, so much so that it one of the most relaxed interviews
Agent Hill had ever experienced.  Throughout the interview, Sami Harb had his cell phone

with him. The interview was interrupted several times as people had questions for the agent and Agent Hill would leave the table to answer questions.  During part of the interview, Agent Hill noticed Michael Harb, who is Sami Harb's cousin, standing at the outside of the window observing the interview.  At least some of the time, the door to the room was open.

The agents' questions included questions about his background, his business, how the business operates, his position and job duties, how he interacted with the producers of his merchandise, and where he shipped his content.  The agents did not tell him the Complaint had been filed in Utah but did tell him the reason they were executing a search warrant had to do with transportation of obscene matter into Utah.  One of the reasons the interview was so long was that Sami Harb gave long answers about his business and the distributors.  He volunteered that he would prefer that there were specific regulations about what distributors could and could not distribute.  He mentioned a problem another company was having.  In that context, he mentioned that he had two attorneys but at no time did he ask to speak to an attorney or ask to have his attorney present.

He responded to all of the agents' questions except that he declined to answer their question about how much money his business made.  The agents did not question him further on that subject.

The interview concluded in less than an hour and they all left the conference room. Sami Harb chose to remain on the premises until the search was concluded.

Sometime later, when the search was still ongoing, Sami Harb used his cell phone to contact his attorney on his cell phone.  He did not ask if could call his attorney, he simply

called him, evidencing that he did not feel constrained.  While on the phone with his attorney, Sami Harb relayed questions to Agent Hill about whether anyone was under arrest and whether he could have a copy of the search warrant.  Agent Hill reiterated that no one was under arrest and that what was going on was just execution of a search warrant.  Agent Hill also explained that they would leave a copy of the search warrant when they left.

Later in the day, Sami Harb expressed to an agent that he appreciated how well he was being treated.  The agents, in turn, testified that they had appreciated that Sami Harb acted calmly and with no vulgarity or antagonism.  The agents were armed but never displayed or unholstered their weapons at any time during the search.  The search lasted about six hours and was finished before the end of the business day.

### III.   DISCUSSION AND CONCLUSIONS

"Police officers need not administer Miranda warnings to everyone they question. On its own terms, *Miranda* applies only to 'custodial interrogations.'  Thus, Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'"[5]

Defendant Sami Harb contends that he was in custody at the time of the questioning and, therefore, should have been given a *Miranda* warning.  The government contends that he was not in custody and that a reasonable person would not have believed he was.   In

---

[5]*United States v. Jones*,  523 F.3d 1235, 1239 (10th Cir. 2008) (quoting *Miranda*, 384 U.S. at 444) (additional citation and quotation marks omitted).

*United States v. Jones*, the Tenth Circuit recently and exhaustively summarized its cases

interpreting controlling United States Supreme Court case law on this issue.

> It is settled that the safeguards prescribed by *Miranda* become applicable only when a suspect's freedom of action is curtailed to a degree associated with formal arrest.  Only then can we say a suspect is in custody.

> Whether a suspect is in custody represents an objective determination.  We therefore must determine whether a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest. . . .

> The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive.  We thus avoid hard line rules and instead allow several non-exhaustive factors to guide us.  First, we consider the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.  Second, we look at the nature of questioning, where prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave.  Finally, by using the following helpful guideposts, we check whether police dominate the encounter:

> Separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.[6]

> Although these factors are useful, we emphasize that we must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others.

Defendant Sami Harb contends that he was in custody because a reasonable

person in his situation would not have believed himself free to terminate the interrogation.

In support he cites the facts that he and the other employees were asked to go from where

---

[6]*Id*. at 1239-40 (all internal quotations, citations, brackets, and quotation marks omitted).

they were to the front desk area, where there were ten armed agents, that one employee was handcuffed for not immediately complying, and that Sami Harb was separated from his cousin and his employees so the interrogation could take place in a small room.

The government contends that Defendant chose to speak with agents and was repeatedly told that he was not under arrest, and that his questioning, therefore, did not evolve into a custodial interrogation that required a *Miranda* warning.

The Court looks first to the agents' demeanor.  As found above, it was calm throughout.  There was no shouting, no display of weapons, and from the beginning, the officers made it clear to the employees in general and to Sami Harb in particular that they were there only to execute the warrant, that people were free to leave as soon as the officers identified them, and that no one was being arrested.  While there were up to twelve agents present, that is not an unduly large number considering the size of the premises.

Although the agents did not explicitly tell Sami Harb he was free to refuse to answer questions, it was implicit in their asking him whether he minded answering questions.  He did refuse to answer questions on one subject, and his refusal was respected.  Shortly before the interview started, Defendant was explicitly told that he was free to leave after being identified.

The questioning was focused on the business and Defendant Sami Harb's role therein.  The interview was prolonged by the length of Defendant's answers.  The interview

8

was relaxed and cordial to an unusual extent.  There was nothing that "would have made a reasonable person in [Defendant's] position believe [he] was effectively under arrest."[7]

Considering whether the agents dominated the encounter, it appears that Defendant was separated from his cousin and other employees due to the noise.  At the time, the atmosphere in the front desk area was calm and orderly.  It was Defendant, not the agents, who chose the location of the interview.  The room he chose was not the back office where he had been working earlier but, instead, was the semi-public conference room, where he remained  visible to others.  Defendant positioned himself in the conference room so that he could still see what going on in the other areas of the building.  Defendant could see his cousin observing the interview through the window.  The door remained open for at least part of the interview.  People came and went with questions for Agent Hill.  Under the totality of the circumstances, the Court finds that Defendant was not isolated and his cousin/Vice President remained in view for moral support.

Although there were twelve agents present in the large warehouse, only two were involved in the interview, the rest went about their business.  There was no array of agents in an aggressive manner.   Even when most of the agents and the employees were in the front desk area, the atmosphere was calm, orderly, and focused on identifying people in the building and the agents did not dominate to the degree associated with formal arrest.

---

[7]*Jones*, 523 F.3d at 1241.

The issue with the briefly handcuffed employee was quickly resolved.  The handcuffs were removed with no repercussion to that employee shortly before the agents asked Sami Harb if he would mind answering questions.

No agent displayed a weapon, there was no physical contact with Defendant. Defendant was never patted down.  As found above, the agents' tone throughout was calm and conversational.

The lack of a coercive atmosphere is supported by the facts that another employee, Michael Harb, the company's vice president, felt free to decline to answer questions.  Other employees accepted at face value the agents' statement they were free to leave after identification and did so.

Based on the totality of the circumstances, the Court finds and concludes that Defendant was not in custody for *Miranda* purposes.  "A reasonable person in [his] position would not feel [his] liberty was restricted to a degree associated with formal arrest."[8]

Defendant does not argue that he asked for a lawyer. Therefore, the Court need not address the government's argument on the subject.

IV.  ORDER

Based on the foregoing, it is therefore

---

[8]*Jones*, 523 F.3d 1244.

10

ORDERED that Defendants' Motion to Suppress Statement (Docket No. 53) is DENIED.

DATED   March 31, 2009.

BY THE COURT:

TED STEWART
United States District Judge